IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

───────────────────────────────────────────────────────────

SUALEH KAMAL ASHRAF,

      Plaintiff,

vs.                      No.: 2:17-cv-02839-SHM-dkv

ADVENTIST HEALTH SYSTEM/
SUNBELT, INC.,

      Defendant.

───────────────────────────────────────────────────────────

REPORT AND RECOMMENDATION ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

───────────────────────────────────────────────────────────

On September 27, 2017, the plaintiff, Dr. Sualeh Kamal Ashraf ("Dr. Ashraf"), filed a *pro se* defamation complaint against the defendant, Adventist Health System/Sunbelt, Inc. ("Adventist Health"), in which he claims that Adventist Health caused him to lose employment opportunities when it reported the revocation of his clinical privileges to the National Practitioner Data Bank ("NPDB").[1] (Compl., ECF No. 1-1.) Before the court is Adventist

───────────────────

[1] The NPDB maintains a database of information about healthcare providers pursuant to Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101 *et seq.* All health care entities are required by the HCQIA to report to the NPDB "a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days." *Id.* § 11133(a)(1). According to the HCQIA, all information is confidential; only health care entities can access the information. *Id.* § 11137(b).

Health's December 14, 2018 motion for summary judgment.[2] (Def.'s Summ. J. Mot., ECF No. 38.) On January 7, 2019, Dr. Ashraf filed a response in opposition to Adventist Health's motion, (Pl.'s Resp., ECF No. 40), and Adventist Health filed a reply on January 22, 2019, (Def.'s Reply, ECF No. 41). The case has been referred to the United States Magistrate Judge for management and for all pretrial matters for determination and/or report and recommendation as appropriate. (Order of Ref., ECF No. 7.)

For the following reasons, it is recommended that Adventist Health's motion for summary judgment be granted.

---

[2] Previously, on November 21, 2017, Adventist Health filed a motion to dismiss Dr. Ashraf's complaint for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6). (Def.'s Mot. Dismiss, ECF No. 6.) On May 14, 2018, the magistrate judge entered a report and recommendation recommending dismissal of the case, (R. & R., ECF No. 20), which the presiding district judge declined to adopt, (Order, ECF No. 28). On July 19, 2018, Adventist Health filed a motion for reconsideration of the order denying Adventist Health's motion to dismiss, (Def.'s Mot. for Recons., ECF No. 29), which the presiding district judge denied on September 17, 2018, (Order, ECF No. 32). On September 27, 2018, Adventist Health filed an answer to Dr. Ashraf's complaint. (Answer, ECF No. 33.)

I.   PROPOSED UNDISPUTED FACTS[3]

The court finds that the following facts are undisputed for the purposes of this motion for summary judgment.

A.   Adventist Health's Initial Precautionary Suspension of Dr. Ashraf's Clinical Privileges

Dr. Ashraf is a cardiac physician and was licensed in Ohio, Florida, and Tennessee.[4]   (Compl. ¶¶ 4, 7, ECF No. 1-1.)   He obtained his medical degree from Ain-Shams University in Cairo, Egypt.   (*Id.*)   Dr. Ashraf was appointed to the medical staff of the Cardiology Department of Florida Hospital Apopka ("Florida Hospital"), which is owned and operated by Adventist Health, in 2003.   (Def.'s Undisputed Facts No. 1, ECF No. 38-2; Pl.'s Resp. 45, ECF No.40.)   On June 20, 2007, a patient ("Patient N.A.") presented at Florida Hospital complaining of chest pain and

---

[3]   In his "Response of Disputed Material Facts Submitted in Response to Motion for Summary Judgment," Dr. Ashraf failed to clearly state, as required by Local Rule 56.1(b), that a fact was undisputed or to demonstrate that a fact is disputed by specific citation to the record or other evidence, which makes the court's task of determining undisputed facts to be very difficult. Rather, Dr. Ashraf's responses were largely argumentative and merely attempts to introduce additional unsupported facts. The court will consider facts undisputed if Dr. Ashraf failed to properly address them, and the court will not accept any of the additional facts asserted by Dr. Ashraf unless there is support for that fact within the record.

[4] Dr. Ashraf's Tennessee Medical License expired in 2004. (Tenn. Dep't of Health Certification Letter, Def.'s Ex. Y; ECF No. 38-27.)

shortness of breath. (Dr. Niederman's Report, Def.'s Ex. I at 2;
ECF No. 38-12.) After determining that the patient had a pulmonary
edema and a Non-ST-elevation myocardial infarction (a heart
attack), Dr. Ashraf took the patient to the cardiac catherization
lab and performed an angioplasty to stabilize the patient.
(Investigative Review Committee ("IRC") R. & R., Def.'s Ex. H at
1; ECF No. 38-11.) The patient was not harmed during the procedure
nor did the patient suffer any complications from Dr. Ashraf's
medical care; Dr. Ashraf, however, did not place an intra-aortic
balloon pump to prepare Patient N.A. for any potential emergency
surgeries, which raised concerns among some of the medical staff
in the catheterization lab. (Hearing Tr., Def.'s Ex. Q at 62-63;
ECF No. 39.)

These concerns were brought to the attention of the Chairman
of the Department of Cardiology, Dr. Arsenio R. Rodriguez ("Dr.
Rodriguez"), who reviewed the case with several co-directors from
the catheterization lab. (IRC R. & R., Def.'s Ex. H at 1; ECF No.
38-11.) Dr. Rodriguez determined that the angioplasty Dr. Ashraf
performed was inappropriate because it provided no benefits to the
patient but could have caused severe damage if done incorrectly or
if complications arose while the procedure was performed. (Hearing
Tr., Def.'s Ex. Q at 44; ECF No. 39.) Upon this realization, Dr.
Rodriguez approached the Medical Staff President, Dr. Philip L.
Sanchez ("Dr. Sanchez"), to discuss the case. (*Id.*)

4

After receiving Dr. Rodriguez's verbal report of the concerns regarding Dr. Ashraf's medical care of Patient N.A., Dr. Sanchez used his authority under Art. III, Part C., Section 1 of Florida Hospital's Medical Staff Policy on Appointment, Reappointment, and Clinical Privileges (the "bylaws"), (Clinical Priv. Bylaws, Def.'s Ex. D at 44; ECF No. 38-7), to place Dr. Ashraf on a "precautionary suspension." (Hearing Tr., Def.'s Ex. Q at 69; ECF No. 39.)  The bylaws define a "precautionary suspension" as "an interim precautionary step in the professional review activity related to any ultimate professional review action." (Clinical Priv. Bylaws, Def.'s Ex. D at 44; ECF No. 38-7.)  On June 22, 2007, Dr. Sanchez sent Dr. Ashraf a letter informing him that, due to concerns "regarding patient safety and quality of care," all of Dr. Ashraf's privileges, except his admitting and consulting privileges, were placed on "precautionary suspension."  (June 22, 2007 Letter, Def.'s Ex. E; ECF No. 38-8.)  In this letter, Dr. Sanchez included excerpts of the applicable provisions of the bylaws, informed Dr. Ashraf that the precautionary suspension would be reported to the Medical Executive Committee ("MEC") on June 25, 2007 and stated that it was "unknown for how long [the] suspension [would] remain in effect." (*Id.*)

B.    Adventist Health's Continued Precautionary Suspension of Dr. Ashraf's Clinical Privileges and the Formal Investigation

At the June 25, 2007 MEC meeting, the MEC voted to continue the precautionary suspension of of Dr. Ashraf's clinical privileges while they conducted a formal investigation. (June 28, 2007 Letter, Def.'s Ex. F; ECF No. 38-9.) The MEC formed the IRC[5] to investigate Dr. Ashraf's medical practices. (IRC R. & R., Def.'s Ex. H at 2; ECF No. 38-11.) Following the MEC meeting, Dr. Sanchez sent Dr. Ashraf another letter informing him that his precautionary suspension was being extended and that the MEC was conducting a formal investigation pursuant to the bylaws. (June 28, 2007 Letter, Def.'s Ex. F; ECF No. 38-9.)

The IRC solicited expert reports from two independent reviewers: Dr. Alan L. Niederman ("Dr. Niederman"), who conducted an independent review of Patient N.A.'s case, and Dr. Fadi Matar ("Dr. Matar"), who issued a report regarding the general trends of Dr. Ashraf's medical practice. Dr. Matar issued his report on September 18, 2007. (Dr. Matar's Report, Def.'s Ex. J; ECF No. 38-13.) Dr. Matar analyzed 88 coronary intervention procedures completed by Dr. Ashraf and concluded that Dr. Ashraf had a slightly higher-than-average "incidence of no reflow and distal embolization" and that his "overall angiographic adverse rates

---

[5] Dr. Sharon Nichols, Dr. Tanya Agard, and Dr. Kerry Schwartz were appointed to serve on the IRC. (June 28, 2007 Letter, Def.'s Ex. F; ECF No. 38-9.)

were similar to" the database of cases compiled to analyze Dr. Ashraf's rates. (*Id.*)

The IRC received Dr. Niederman's report October 23, 2007. (Dr. Niederman's Report, Def.'s Ex. I at 2; ECF No. 38-12.)   In his report, Dr. Niederman opined that Dr. Ashraf's "management [was] completely below the standard of care" and that "the critical thinking involved with this patient's care is quite worrisome." (*Id.*)   Further, Dr. Niederman advised that Dr. Ashraf's actions "placed this patient at significant unnecessary risk and did nothing to further her medical care." (*Id.*)

In addition to soliciting and reviewing the two independent experts' reports, the IRC reviewed case files from twenty-three patients who received an IVC filter placed by Dr. Ashraf, eight of whom it determined were treated below the appropriate standard of care; it also reviewed the records of an additional fifteen patients; and it interviewed eight individuals regarding Dr. Ashraf's medical practice, including Dr. Ashraf. (IRC R. & R., Def.'s Ex. H; ECF No. 38-11.)   The IRC met a total of four times between its organizational meeting on September 26, 2007 and October 31, 2007. (*Id.* at 8.)   The IRC recommended to Dr. Sanchez, the Medical Staff President, "that the staff appointment and clinical privileges of S. Kamal Ashraf, MD, be revoked." (*Id.* at 9.)

C.    Adventist Health's Precautionary Suspension of All Dr. Ashraf's Clinical Privileges

On November 5, 2007, based on the IRC's report and recommendation, Dr. Sanchez informed Dr. Ashraf via letter that all his privileges – including his admitting and consulting privileges – were placed on precautionary suspension due to concerns that arose regarding "patient safety and quality of care, more specifically patient endangerment." (Nov. 5, 2007 Letter, Def.'s Ex. K; ECF No. 38-14.)  Additionally, Dr. Sanchez advised Dr. Ashraf that the IRC intended to report its findings to the MEC at its November 19, 2007 meeting.  (*Id.*)

On November 15, 2007, the IRC issued a lengthy written report and recommendation detailing its investigation and findings.  This report included twenty-two factual findings regarding Dr. Ashraf's care and summarized the IRC's conclusions as follows:

> Based on the above reviews, the committee members continue to have significant reservation as to Dr. Ashraf's ability to continue to practice in this institution. One of the most concerning aspects of this review is this physician's apparent lack of medical knowledge in terms of cardiac care. He fails to provide emergency cardiac care to critically ill patients in a timely manner. He also fails to recognize interventional complications on a regular basis. He has an apparent lack of regard for his patient's wellbeing. He has no insight into his own limitations as a cardiologist and does not appear to have learned from his mistakes.

(IRC R. & R. at 9, Def.'s Ex. H; ECF No. 38-11.)  Based on this analysis, the IRC recommended that Dr. Ashraf's staff appointment and clinical privileges be revoked.  On November 19, 2007, the MEC

voted to uphold the recommendation and informed Dr. Ashraf of its decision in a letter dated November 27, 2007.  (Nov. 27, 2007 Letter, Def.'s Ex. L; ECF No. 38-15.)  In this letter, the MEC cited the twenty-two factual findings from the IRC's report and recommendation as the primary reasons for its decision to revoke all Dr. Ashraf's privileges and advised Dr. Ashraf of his right to request a hearing under the bylaws and his right to secure legal counsel.  (*Id.*)

D.    The Hearing and Subsequent Revocation of Dr. Ashraf's Appointment and Privileges at Florida Hospital

Dr. Ashraf retained an attorney, George Indest III of the Health Law Firm, and, on December 27, 2007, he requested a hearing and full discovery.  (Dec. 27, 2007 Letter, Def.'s Ex. M; ECF No. 38-16.)  On February 22, 2008, the MEC issued a "Notice of Hearing and Statement of Reasons" to Dr. Ashraf which set a hearing for March 25, 2008.  The notice included a summary of the proceedings that had occurred to date, the names of the panel members reviewing his case at the hearing, and a list of the witnesses the MEC was considering calling at the hearing.  (Notice of Hearing, Def.'s Ex. N; ECF No. 38-17.)  At the request of Dr. Ashraf's attorney, the presiding hearing officer and the panel members were changed. Approximately seven months later, on July 9, 2008, Dr. Ashraf's attorney withdrew from representing him, (July 9, 2008 Letter,

Def.'s Ex. O; ECF No. 38-18), and the hearing was rescheduled,

(Notice of Rescheduling of Hearing, Def.'s Ex. P; ECF No. 38-19).

A two-day hearing was held on September 8 and 9, 2008. The
hearing panel was made up of three physicians (the "Hearing
Panel")[6] and an attorney[7] served as the presiding officer for the
hearing. Dr. Karan Reddy ("Dr. Reddy") acted as Dr. Ashraf's
physician advocate and representative at the hearing. At the
hearing, Dr. Ashraf was permitted to present opening and closing
statements,[8] submit evidence, cross-examine the MEC's witnesses,
call his own witnesses (including expert witnesses), and testify
on his own behalf. (Hearing Tr., Def.'s Ex. Q; ECF No. 39.)

On September 23, 2008, the Hearing Panel affirmed the MEC's
recommendation and advised Dr. Ashraf of its determination and his
right to appeal the decision. (Hearing Panel Report, Def.'s Ex.
R; ECF No. 38-20.) On October 1, 2008, Dr. Ashraf requested an
appeal of the Hearing Panel's decision, (Oct. 1, 2008 Letter,
Def.'s Ex. S; ECF No. 38-21), and an appellate hearing was held on

---

[6] Dr. Michael Yurso, Dr. Pradipkumar P. Jamnadas, and Dr.
Roberto Perez served on the hearing panel.

[7] George B. McVay Voght.

[8] Dr. Reddy waived the opportunity to present an opening
statement, even though she was offered the opportunity to do so at
the beginning of the hearing and before the presentation of Dr.
Ashraf's case in chief. (Hearing Tr., Def.'s Ex. Q at 191; ECF
No. 39.)

October 27, 2008, (Appellate Panel Letter, Def.'s Ex. T; ECF No.
22).  The Appellate Panel voted to uphold the decision of the
Hearing Panel, which was approved and upheld by the hospital's
Governing Board, resulting in the revocation of Dr. Ashraf's
appointment and clinical privileges. (President's Report, Def.'s
Ex. V; ECF No. 38-24.)

E.    Adventist Health's Report to the NPDB

On December 17, 2008, Adventist Health reported the
revocation of Dr. Ashraf's privileges to the NPBD.  In its report,
Adventist Health listed the twenty-two factual findings the IRC
included in its report recommending the revocation of Dr. Ashraf's
clinical privileges at Florida Hospital.[9]  Under the section of
the report titled "Description of Subject's Act(s) or Omission(s)
or Other Reasons for Action(s) Taken and Description of Action(s)
Taken by Reporting Entity," Adventist Health stated:

_____

[9] In its answer to Dr. Ashraf's complaint, Adventist Health
denied that the findings were included in its report to the NPDB,
(Answer ¶ 20, ECF No. 33), and the copy of the NPDB report provided
to the court does not include the IRC's factual findings in it,
(NPDB Report, Def.'s Ex. W; ECF No. 38-25).  In its motion to
dismiss, however, Adventist Health stated that "[t]he NPDB report
contains, verbatim, the 22 findings issued by the IRC in November
2007." (Def.'s Mot. Dismiss Mem. 3, ECF No. 6-1.)  *See Ashraf v.
Adventist Health System/Sunbelt, Inc., d/b/a Florida Hospital
Apopka,* 200 So. 3d 173, 174 (Fla. Dist. Ct. App. 2016), *review
denied,* No. SC16-1389 (Fla. Aug. 23, 2016)"Florida Hospital's
report to the NPDB contained verbatim the 22 Factual Findings
issued by the IRC.")  Accordingly, the court finds, for purposes of
summary judgment, that it is undisputed that the IRC's twenty-two
factual findings were included in Adventist Health's NPDB report.

> Following a formal investigation due to quality of care concerns involving Dr. Ashraf's cardiology privileges, the Executive Committee voted to revoke his appointment and privileges. This action was upheld by a fair hearing panel, an appeal panel, and ultimately the hospital board.

(NPDB Report, Def.'s Ex. W at 4; ECF NO. 38-25.)

Nearly six years later, in October 2014, Dr. Ashraf filed a defamation lawsuit against Adventist Health in the state of Florida to "address this grievance." (Compl. ¶ 14, ECF No. 1-1.) The Florida court dismissed the suit as untimely because the two-year statute of limitations for bringing a defamation suit under Florida's law had expired. (*Id.* ¶ 15.) The decision was affirmed by the Florida Fifth District Court of Appeals. *See Ashraf v. Adventist Health System/Sunbelt, Inc., d/b/a Florida Hospital Apopka,* 200 So. 3d 173 (Fla. Dist. Ct. App. 2016), *review denied,* No. SC16-1389 (Fla. Aug. 23, 2016).

Dr. Ashraf eventually returned to Tennessee hoping to find a new job, but claims he was unsuccessful. (Compl. ¶¶ 3, 18, ECF No. 1-1.) On September 27, 2017, Dr. Ashraf filed a *pro se* defamation complaint against Adventist Health in the state of Tennessee, which was removed to this court on November 15, 2017, on the basis of diversity jurisdiction. (Notice of Removal, ECF No. 1.) In his complaint, Dr. Ashraf alleges that Adventist Health "yielded to a competitive medical group to investigate Dr. Ashraf," resulting in his dismissal from his position at Florida Hospital,

and that the publication of "false and defamatory" statements with the NPDB has prevented Dr. Ashraf from being able to open a medical practice in Tennessee.  (Compl. ¶¶ 9, 13, 18, 22; ECF No. 1-1.) For relief, Dr. Ashraf seeks injunctive relief in the form of "an order to the removal [sic] of the wrong and false report," monetary damages for "expenses, costs, interest, attorney's fees," and "any other relief this Court deems just and proper."  (*Id.* at p. 7.)

## II.  PROPOSED CONCLUSIONS OF LAW

In its motion, Adventist Health contends that it is entitled to summary judgment on Dr. Ashraf's defamation claim because, pursuant to the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101 *et seq.*, Adventist Health is immune from any liability for any damages and/or injunctive relief related to Adventist Health's actions revoking Dr. Ashraf's privileges and its reporting of those actions the NPDB. (Def.'s Summ. J. Mot. Mem. 9, ECF No. 38-1.)

## A.  Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993); *Osborn v. Ashland Cnty. Bd. of Alcohol, Drug Addiction & Mental Health Servs.*, 979 F.2d 1131, 1133 (6th Cir.

1992)(per curium).   The moving party has the burden of showing that there are no genuine issues of material fact at issue in the case.   *LaPointe*, 8 F.3d at 378.   This may be accomplished by pointing out to the court that the non-moving party lacks evidence to support an essential element of its case.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

In response, the non-moving party must go beyond the pleadings and present significant probative evidence to demonstrate that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993); *see also LaPointe*, 8 F.3d at 378.   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *LaPointe*, 8 F.3d at 378.

In deciding a motion for summary judgment, the "[c]ourt must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993)(quoting *Anderson*, 477 U.S. at 251–52).   The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light

most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Patton*, 8 F.3d at 346; *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). However, to defeat a motion for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252; *LaPointe*, 8 F.3d at 378. Finally, a court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Anderson*, 477 U.S. at 255; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

B.    <u>Adventist Health's Immunity under the HCQIA for Monetary Damages for Revoking Dr. Ashraf's Clinical Privileges</u>

"The HCQIA was passed in 1986 to provide for effective peer review and interstate monitoring of incompetent physicians, and to grant qualified immunity from damages for those who participate in peer review activities." *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 467 (6th Cir. 2003)(citing *Austin v. McNamara*, 979 F.2d 728, 733 (9th Cir. 1992)). For a party to gain protection under the HCQIA from claims for damages, the actions taken against an individual physician must meet the statutory provisions defining the action as a "professional review action," and the party must have conducted the "professional review action" in a

reasonable manner. 42 U.S.C. § 11111(a)(1). Whether a professional review action was reasonably conducted is evaluated using a four-factor reasonableness test under § 11112(a) under an objective standard. *Deming v. Jackson-Madison Cty. Gen. Hosp. Dist.*, 553 F. Supp. 2d 914, 925 (W.D. Tenn. 2008). Therefore, when reviewing whether a professional review action was "reasonable," the evidence that "is relevant, and dispositive, is whether there existed an objectively reasonable basis for the defendant's actions." *Id.*

If these requirements are met, the HCQIA provides a rebuttable presumption of immunity to:

> (A)  the professional review body,
>
> (B)  any person acting as a member or staff to the body,
>
> (C)  any person under a contract or other formal agreement with the body, and
>
> (D)  any person who participates with or assists the body with respect to the action[.]

42 U.S.C. § 11111(a)(1). A "professional review body" is "a health care entity and the governing body or any committee of a health care entity." *Id.* § 11151(11). "[A] hospital that is licensed to provide health care services by the State in which it is located" and "an entity . . . that provides health care services and that follows a formal peer review process for the purpose of furthering quality health care" are considered health care entities under the HCQIA. *Id.* § 11151(4)(A).

16

If a health care entity conducts a peer review of a physician's actions that satisfies the requirements set forth in the HCQIA, a rebuttable presumption of immunity as to damages is applied, "forcing the plaintiff to prove that the defendant's actions did not comply with the relevant standards." *Meyers*, 341 F.3d at 467-68(citing 42 U.S.C. § 11112(a)). "[T]his rebuttable presumption 'creates an unusual summary judgment standard' that can be stated as follows: 'Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?'" *Id.* (quoting *Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33 F.3d 1318, 1333 (11th Cir. 1994)). In ruling on a motion for summary judgment, it is not the role of the court "to substitute []its judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges," but only to ensure the physician was afforded due process. *Meyers v. Logan Mem. Hosp.,* 82 F. Supp. 2d 707, 716, (W.D. Ky. January 27, 2000) (citing *Bryan*, 33 F.3d at 1337). Thus, the burden is on Dr. Ashraf to prove by a preponderance of the evidence that Adventist Health is not entitled to immunity.

### 1. Professional Review Action

It is undisputed that Adventist Health is a health care entity and that the IRC and the MEC were professional review bodies within

the meaning of the HCQIA.  In order to qualify for HCQIA immunity, a professional review body must establish that it was conducting a "professional review action."  The HCQIA defines a "professional review action" as:

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

42 U.S.C. § 11151(9).  The HCQIA clarifies that the term "adversely affecting" includes "reducing, restricting, suspending, revoking, denying, or failing to renew clinical privileges or membership in a health care entity."  *Id.* § 11151(1).  A "professional review activity" under the statute is an activity of a health care entity with respect to an individual physician:

> (A)  to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,
>
> (B)  to determine the scope or conditions of such privileges or membership, or
>
> (C)  to change or modify such privileges or membership.

*Id.* § 11151(10).

It is undisputed that Adventist Health's peer review process was a professional review activity as defined in the HCQIA and that its final act of terminating all Dr. Ashraf's privileges,

including his admitting and consulting privileges, was a professional review action as defined in the HCQIA.[10]

2.  *Reasonableness of Adventist Health's Professional Review Actions*

Adventist Health's professional review action against Dr. Ashraf met all the reasonableness requirements under the HCQIA thereby entitling Adventist Health to a rebuttable presumption of immunity against any claim for damages. (Def.'s Summ. J. Mot. Mem. 14, ECF No. 38-1.)

A healthcare entity participating in a professional review action is entitled to immunity if the professional review action was pursued:

(1) in the reasonable belief that the action was in furtherance of quality health care;

(2) after a reasonable effort to obtain the facts of the matter;

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable

_____

[10] Florida Hospital's bylaws specify that a "precautionary suspension" is not a "professional review action," but is instead "an interim precautionary step in the professional review activity related to any ultimate professional review action." (Clinical Priv. Bylaws, Def.'s Ex. D at 44; ECF No. 38-7.) The entire peer review process constitutes Adventist Health's professional review activity under the HCQIA.

> effort to obtain facts and after meeting the
> requirement of paragraph (3).

42 U.S.C. § 11112(a); *see also Moore*, 492 F. App'x at 636. If the professional review action satisfies these reasonableness standards, then the persons participating in the review "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action." 42 U.S.C. § 11111(a)(1).

"A professional review action is presumed to satisfy HCQIA's four-factor reasonableness test for immunity unless rebutted by a preponderance of the evidence." *Moore*, 492 F. App'x at 638(citing 42 U.S.C. § 11112(a)). Thus, Dr. Ashraf has the burden of proving by a preponderance of the evidence that Adventist Health did not conduct an objectively reasonable professional review action in accordance with the four-factor reasonableness test under § 11112(a). "Although Plaintiff has the burden to show, by preponderance of the evidence, that Moving Defendants failed to satisfy the requirements of § 11112(a), the Court still views the facts in the light most favorable to Plaintiff - the non-moving party for the purposes of summary judgment." *Stratienko, M.D. v. Chattanooga-Hamilton Cty. Hosp. Auth.*, No. 1:07-CV-258, 2008 WL 4191275, at *4 (E.D. Tenn. Sept. 8, 2008).

a.    Reasonable Belief in Furtherance of Quality Care

To rebut the presumption that Adventist Health's professional review action was reasonable, Dr. Ashraf must first establish that Adventist Health's decisions to suspend his privileges and ultimately to revoke his clinical privileges were not "reasonably intended to improve the quality of health care for [Dr. Ashraf's] patients." *Moore*, 492 F. App'x at 639 (citing 42 U.S.C. § 11112(a)(1)). "The HCQIA does not require that the professional review result in actual improvement in the quality of health care, but only that it was undertaken in the reasonable belief that quality health care was being furthered." *Abu-Hatab v. Blount Mem'l Hosp., Inc.*, No. 3:06-CV-436, 2009 WL 921129, at *10 (E.D. Tenn. Apr. 2, 2009)(citing *Meyers*, 341 F.3d at 468).

Throughout his response to the motion for summary judgment, Dr. Ashraf seeks to have the court reweigh the evidence and substitute its judgment for that of the IRC and the Hearing Panel. In his response, Dr. Ashraf alleges that the Hearing Panel, Dr. Nichols, and the Appellate Panel were in direct economic competition with him. The court interprets this as an argument that the peer review process was not reasonably intended to improve the quality of health care for patients at Florida Hospital. (Pl.'s Resp. 9, 10, 12, ECF No. 40.) He also contends that Dr. Yurso, a member of the Hearing Panel, threatened him during the hearing by indicating that prolonging the hearing unnecessarily

would be unfavorable to Dr. Ashraf. (*Id.* at 6.) "Whether the reviewers were subjectively motivated by bad faith is irrelevant." *Deming*, 553 F. Supp. 2d at 925. Rather, to establish a genuine issue as to the existence of a particular element, Dr. Ashraf must point to evidence in the record that would enable a reasonable jury to find in his favor. *See Anderson,* 477 U.S. at 248. Because there is no evidence in the record to support Dr. Ashraf's position that the members of the IRC or the Hearing Panel were objectively in direct economic competition with Dr. Ashraf, Dr. Ashraf has failed to establish a genuine issue as to this fact.

Dr. Ashraf also contends that the formal investigation was begun in response to concerns regarding one patient, Patient N.A., who did not suffer any health complications or harm as a result of Dr. Ashraf's care, which evidences that Adventist Health's primary concern was not the quality of care Dr. Ashraf's patients received. (Pl.'s Resp. 16, ECF No. 40.) Contrary to Dr. Ashraf's contention, the HCQIA does not require a professional review body to wait until a patient is harmed before it acts "in the furtherance of quality health care." 42 U.S.C. § 11112(a)(1). At each stage of the peer review process, Adventist Health specifically indicated that it was concerned with "patient safety" or "quality of care." (*See e.g.*, June 22, 2007 Letter, Def.'s Ex. E; ECF No. 38-8; Nov. 5, 2007 Letter, Def.'s Ex. K; ECF No. 38-14.)

Thus, a reasonable jury could not conclude, by a preponderance of the evidence, that Adventist Health acted at any point during the peer review process with anything other than a reasonable belief that its actions would reasonably improve the quality of health care for the hospital's patients.

b.   Reasonable Effort to Obtain the Facts of the Matter

To establish that Adventist Health's professional review actions were "taken in the absence of a reasonable effort to obtain the relevant facts," the second factor of the four-factor reasonableness test, Dr. Ashraf must show Adventist Health failed to make a reasonable effort to obtain the facts of the matter. *See Moore*, 492 F. App'x at 639.   The "'HCQIA is designed to facilitate the frank exchange of information among professionals conducting peer review inquiries without the fear of reprisals in civil lawsuits.'"   *Holland v. Upper Valley Med. Ctr.*, No. 3:07-CV-212, 2008 WL 2491657, at *2 (S.D. Ohio June 18, 2008)(quoting *Bryan v. James E. Holmes Medical Ctr.*, 33 F.3d 1318 (11th Cir. 1994)).   Accordingly, the court's analysis of whether a health care entity made a reasonable effort to obtain facts is not directed at whether the facts gathered were undisputedly true, but at whether the reviewing body's reliance upon that information was reasonable.   *See Meyers*, 341 F.3d at 469.

Dr. Ashraf argues that Dr. Sanchez relied upon statements of unidentified "co-directors" whom Dr. Rodriguez consulted regarding

Patient N.A.'s case to support his decision to initially place Dr.
Ashraf on a precautionary suspension, which the court interprets
as an argument that Adventist Health failed to make a reasonable
effort to obtain the facts.   (Pl.'s Resp. at 46, ECF No. 40.)
Additionally, Dr. Ashraf contends that because of Adventist
Health's failure to obtain the identities of the co-directors that
reported Patient N.A.'s case to Dr. Rodriguez, he was not able to
cross-examine these co-directors at any point during the
investigation or the hearing in September of 2008.

In support of his argument, Dr. Ashraf cites to *Osuagwu v.
Gila Reg'l Med. Ctr.*, for the principle that, when determining
whether to take action against a physician, the use of comments
and opinions from unidentified personnel is inherently improper.
938 F. Supp. 2d 1142, 1162 (D.N.M. 2012).   The holding in *Osuagwu*
is distinguishable from Dr. Ashraf's case.   Unlike the plaintiff
in *Osuagwu*, Dr. Ashraf was provided with ample information prior
to his hearing regarding the information the MEC used to make its
conclusions.

In *Osuagwu v. Gila Reg'l Med. Ctr.*, the district judge
explained that Dr. Osuagwu "was put at a severe disadvantage
because the MEC had never specified its concerns with Plaintiff's
performance before the hearing, other than in vague terms, and did
not present anything other than the anonymous peer-review forms
and [one doctor's] summary at the hearing." *Id.* at 1162.   In this

24

case, the IRC and the MEC made numerous in-depth efforts to obtain factual evidence and were successful in doing so. Regarding Dr. Sanchez's initial decision to place Dr. Ashraf on precautionary suspension, Dr. Sanchez was presented with information not only from a number of co-directors from the catheterization lab, but also from Dr. Rodriguez, who personally reviewed Dr. Ashraf's care of Patient N.A. within two days of the procedure that raised concerns. In addition, in its efforts to obtain factual information, the IRC hired two outside experts to conduct independent reviews of the case and data giving rise to the investigation. Further, prior to revoking the remainder of Dr. Ashraf's privileges on November 5, 2007, the IRC investigated twenty-three cases, which were outlined in the IRC report and recommendation, in addition to interviewing eight individuals regarding Dr. Ashraf's quality of care, including Dr. Ashraf himself. Finally, at the September 2008 hearing, the MEC presented four witnesses, all whom Dr. Ashraf had an opportunity to cross-examine. None of these efforts to obtain factual information occurred in *Osuagwu v. Gila Reg'l Med. Ctr.*

In another attempt to have the court reweigh the evidence and substitute its judgment for that of the hospital, Dr. Ashraf attacks the reliability of Dr. Niederman's report and the credibility of Dr. Niederman. (Pl.'s Resp. 5-8, ECF No. 40.) Dr. Ashraf argues that Dr. Niederman's report evaluating his standard

of care is inaccurate and was improperly considered because Dr. Niederman's testimony at the September 2008 hearing contradicted the conclusions he made in his report.   Dr. Ashraf attached information about the FDA imposing sanctions on Dr. Niederman for reporting false information regarding research studies he conducted between 2007 and 2008.  (FDA Report, Pl.'s Ex. 6; ECF No 40.)

Whether the discrepancies discovered at Dr. Ashraf's hearing rendered the IRC's recommendation arbitrary or capricious was the Hearing Panel's determination, while the court is tasked with evaluating whether the Hearing Panel made a reasonable effort to obtain the material facts necessary to make that determination; it is not the court's task to determine whether Dr. Niederman's conclusions or Dr. Nichols's conclusions were wholly invalidated due to the testimony at the hearing.   Adventist Health did not solely rely upon Dr. Niederman's testimony in making its determination.  (*See supra* Section I.C.)  The IRC's investigation, absent Dr. Niederman's review, sufficiently establishes that Adventist Health made a reasonable effort to obtain the material facts related to this case.   Neither its bylaws nor the HCQIA required Adventist Health to solicit the advice of outside experts during its investigation; it merely chose to do so.  As to the FDA report admonishing Dr. Niederman, the IRC objectively had no reason to doubt Dr. Niederman's credibility at the time it conducted its

review: the FDA report disciplining Dr. Niederman was not published until 2009, well after Dr. Ashraf's clinical privileges had been revoked.  (FDA Report, Pl.'s Ex. 6; ECF No 40.)

Dr. Ashraf also attacks the portion of Dr. Nichols's testimony in which she states, "I was wrong about the upper extremity DVT. I was not wrong about the arm trauma."  (Hearing Tr., Def.'s Ex. Q at 166; ECF No. 39.)  Dr. Ashraf contends that this conclusion directly contradicts the IRC's factual assertion that "Dr. Ashraf placed an IVC filter in a patient with an upper extremity DVT and pulmonary emboli.  The clot source was clearly above where the filter was placed and could not provide any benefit to the patient," which Adventist Health reported to the NDPB.  (IRC R. & R., Def.'s Ex. H at 7; ECF No. 38-11.)  Dr. Ashraf neglects to point out that following this statement, Dr. Nichols noted that her uncertainty regarding the case arises from Dr. Ashraf's failure to write a consult, which the IRC repeatedly explained hindered his quality of care.  (*Id.* at 168.)

Relying on *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324 (10th Cir. 1996), Dr. Ashraf contends that the formal investigation was "triggered by one single case," which was "unreasonably restrictive and not taken after a 'reasonable effort to obtain the facts' in order to comport with the HCQIA." (Pl.'s Resp. 17, ECF No. 40.)  *Brown* is distinguishable from the instant case.

In *Brown v. Presbyterian Healthcare Servs.*, the Tenth Circuit analyzed whether a jury could conclude that the defendant's review of two charts sufficiently established that the physician failed to obtain appropriate consultation in breach of her contract with the hospital and therefore provided a sufficient factual basis for the peer review panel's *revocation* of the physician's privileges. *Id.* at 1333-34. In Dr. Ashraf's case, the IRC reviewed case files from twenty-three patients who received an IVC filter placed by Dr. Ashraf and analyzed ten separate cases to determine whether the quality of Dr. Ashraf's care was up to par, which is significantly more extensive than the two-case review conducted in *Brown* to determine whether the physician breached her contract. (IRC R. & R., Def.'s Ex. H; ECF No. 38-11.)

Further, in *Brown*, after opining that the defendant in that particular case was not subject to the qualified immunity provided by the HCQIA, the Tenth Circuit explained in a footnote why it found the defendants' particular argument *Brown* to be problematic:

> According to the defendants, "a difference of opinion among experts" does not raise an issue as to the objective reasonableness of the inquiry. We are not persuaded by the defendant's view. Under its theory, a peer review participant would be absolutely immune from liability for its actions so long as it produced a single expert to testify the requirements of 42 U.S.C. § 11112(a) were satisfied. This would be in direct contravention to Congress' intention to provide "qualified immunity." Moreover, to remove a plaintiff's claims from the jury simply because "a difference of opinion among experts" exists would abrogate the jury's responsibility to weigh the evidence and determine the

> credibility of witnesses.  Thus, in determining whether
> a peer review participant is immune under the Health
> Care Quality Improvement Act, the proper inquiry for the
> court is whether [a physician] has provided sufficient
> evidence to permit a jury to find she has overcome, by
> a preponderance of the evidence, any of the four
> statutory elements required for immunity under 42 U.S.C.
> § 11112(a).

*Id.* at 1334 n.9 (internal citations omitted).  Dr. Ashraf has not

presented any expert testimony to support his conclusion that the

information obtained from Patient N.A.'s case was insufficient to

support the MEC's decision to suspend his privileges while it

investigated.  Unlike the physician in *Brown*, Dr. Ashraf has not

provided evidence that Adventist Health failed to make a reasonable

effort to obtain and consider facts in its evaluation.

Accordingly, a reasonable jury could not find, by a

preponderance of evidence, that Adventist Health failed to make a

reasonable effort to obtain the facts of the matter.

c.   Adequate Notice and Fair Hearing

The third factor for HCQIA immunity requires that a

"professional review action must be taken . . . after adequate

notice and hearing procedures are afforded to the physician

involved or after such other procedures as are fair to the

physician under the circumstances."  42 U.S.C. § 11112(a)(3).

"Section 11112(b) creates a safe harbor whereby professional

review actions meeting the provisions of that section will be

deemed to have met the notice and hearing requirement of §

11112(a)(3)." *Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 841

(3d Cir. 1999).  As the Sixth Circuit explained in *Meyers*, the

"notice and hearing procedures" requirement of § 11112(a)(3) is

met if a health care entity follows the following procedures:

> 1. The physician has been given notice stating that a
> professional review action has been proposed to be taken
> against the physician, reasons for the proposed action,
> that the physician has the right to request a hearing on
> the proposed action, any time limit (of not less than 30
> days) within which to request such a hearing, and a
> summary of the rights in the hearing....
>
> 2. If a hearing is requested on a timely basis ..., the
> physician involved must be given notice stating the
> place, time, and date, of the hearing, which date shall
> not be less than 30 days after the date of the notice,
> and a list of the witnesses (if any) expected to testify
> at the hearing on behalf of the professional review body.
>
> 3. If a hearing is requested on a timely basis ..., the
> hearing shall be held (as determined by the health care
> entity) before an arbitrator mutually acceptable to the
> physician and the health care entity, before a hearing
> officer who is appointed by the entity and who is not in
> direct economic competition with the physician involved,
> or before a panel of individuals who are appointed by
> the entity and are not in direct economic competition
> with the physician involved.
>
> 4. [I]n the hearing the physician involved has the right
> to representation by an attorney or other person of the
> physician's choice, to have a record made of the
> proceedings, copies of which may be obtained by the
> physician upon payment of any reasonable charges
> associated with the preparation thereof, to call,
> examine, and cross-examine witnesses, to present
> evidence determined to be relevant by the hearing
> officer, regardless of its admissibility in a court of
> law, and to submit a written statement at the close of
> the hearing; and upon completion of the hearing, the
> physician involved has the right to receive the written
> recommendation of the arbitrator, officer, or panel,
> including a statement of the basis for the
> recommendations, and to receive a written decision of

the health care entity, including a statement of the
basis for the decision.

*Meyers*, 341 F.3d at 470-71.  That being said, "[a] professional
review body's failure to meet the conditions described in [§
11112(b)] shall not, in itself, constitute failure to meet the
standards" of the HCQIA's notice and hearing requirement.  42
U.S.C. § 11112(b).

In his response in opposition to the motion for summary
judgment, Dr. Ashraf presents twelve deficiencies he perceives in
Adventist Health's professional review action which render the
safe harbor provisions of §1112(c) inapplicable including, *inter
alia*, the following:  (1) Dr. Ashraf was not provided with proper
notice of the proceedings; (2) Dr. Ashraf was not permitted to
have an attorney represent him during the investigation; (3) Dr.
Ashraf was not afforded the opportunity to have a hearing prior to
the suspension of his privileges; (4) the September 2008 hearing
was conducted as an appellate review of the IRC's determination;
and (5) no finding was ever made that Dr. Ashraf's conduct posed
imminent danger to the health of an individual.  (Pl.'s Resp. at
8-10, ECF No. 40.)

At the crux of Dr. Ashraf's argument is his allegation that
he had a right to a hearing prior to Adventist Health's imposition
of the precautionary suspension of his clinical privileges.
According to Adventist Health's bylaws, however, a physician

31

placed on a "precautionary suspension" is not entitled to a hearing or the right to be represented by legal counsel at any meetings conducted during the hospital's formal investigation. (Clinical Priv. Bylaws, Def.'s Ex. D at 42; ECF 38-7.) Additionally, the bylaws encourage an investigation committee, such as the IRC in Dr. Ashraf's case, to release its recommendation within 30 days unless an outside reviewer is included, at which point the investigation committee is encouraged to release its opinion between 60 and 90 days after it receives the outside reviewer's report. In Dr. Ashraf's case, the IRC held its first meeting on September 26, 2007, ninety-three days after the MEC formed the IRC and requested a recommendation. The IRC received Dr. Matar's report on October 1, 2007 and Dr. Niederman's report on October 23, 2007, and on November 15, 2007, the IRC released its report and recommendation to the MEC. The investigation lasted for a total of 143 days.

The reasonableness factors under the HCQIA impose a set of national standards that are applicable to all health care entities attempting to secure immunity under the statute. Although a health care entity's substantial compliance with its bylaws during the peer review process will typically afford it immunity from suit, perfect compliance with bylaws that fail to comply with the HCQIA will not, by itself, establish that a defendant is not entitled to immunity. *Cf. Wahi v. Charleston Area Med. Ctr.*, 453 F. Supp. 2d

942, 956 (S.D.W. Va. 2006), *aff'd sub nom. Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599 (4th Cir. 2009)("As long as a hospital's bylaws provide basic procedural protections, and these bylaws are substantially followed in a particular disciplinary proceeding, a court will usually not interfere with the committee's recommendation.")

Upon being approached with concerns that Dr. Ashraf performed an unnecessary angioplasty, Dr. Sanchez suspended all of Dr. Ashraf's privileges, except his admitting and consulting privileges. This initial suspension only lasted until June 25, 2007, when the MEC voted to continue the suspension of Dr. Ashraf's clinical privileges while they conducted a formal investigation. In a letter dated June 28, 2007, Dr. Ashraf was advised that his privileges were suspended for an unspecified amount of time to "allow for investigation into concerns regarding [his] quality of care." (June 28, 2007 Letter, Def.'s Ex. F; ECF No. 38-9.)

Under the HCQIA, "an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual," is permissible. *Id.* § 11112(c)(2). When reviewing a peer review action to determine whether a health care entity is entitled to HCQIA immunity, the court's "role is not to second-guess the merits of the MEC's decision, but rather to consider whether the

33

procedures afforded were fair and whether the members of the MEC made a reasonable investigation and a reasonable decision based on the facts before them." *Johnson v. Spohn*, 334 F. App'x 673, 680 (5th Cir. 2009).  In this case, the record shows that Adventist Health had grounds to reasonably believe that Dr. Ashraf's medical practices were imminently endangering the lives of his patients. Several doctors became concerned after Dr. Ashraf performed an angioplasty on Patient N.A. because it could have caused severe damage to the patient if done incorrectly or if complications arose while the procedure was performed and had no chance of benefitting the patient.  (Hearing Tr., Def.'s Ex. Q at 44; ECF No. 39.) Although Patient N.A. suffered no harm, the patient's health was endangered by Dr. Ashraf's arbitrary procedure.  In its letter providing Dr. Ashraf with notice of his suspension, the MEC specified that Dr. Ashraf's suspension was being extended to "allow for investigation into concerns regarding [his] quality of care." (June 28, 2007 Letter, Def.'s Ex. F; ECF No. 38-9.)

Further, the record shows that Adventist Health made reasonable efforts to provide Dr. Ashraf with "subsequent notice and hearing or other adequate procedures."  42 U.S.C. § 11112(c)(2).  Although the IRC is not required to meet with the physician it is investigating, the letter notifying Dr. Ashraf of his suspension assured him that the IRC would meet and discuss the situation with him prior to making its recommendation.  After

34

completing its investigation, Adventist Health provided Dr. Ashraf with a hearing to review the IRC's recommendation and the MEC's decision to recommend revocation of Dr. Ashraf's privileges to the hospital's board.  At the hearing, Dr. Ashraf was permitted to present opening and closing statements, submit evidence, cross-examine the MEC's witnesses, call his own witnesses (including expert witnesses), and testify on his own behalf.  (Hearing Tr., Def.'s Ex. Q; ECF No. 39.)

Upon reviewing the procedure giving rise to the peer review of Dr. Ashraf's medical practice; the letters providing Dr. Ashraf with notice of each suspension, the investigation, and his right to a hearing; the IRC's interview with Dr. Ashraf before making its recommendation; and the hearing afforded Dr. Ashraf, a reasonable jury could not find, by a preponderance of the evidence, that the notice and hearing procedures employed in this case were unfair.

d.   Reasonable Belief that the Action was Warranted

As to the fourth factor of the HCQIA's four-factor reasonableness test, the plaintiff must show that the professional review action was not taken "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts."  *Id.* at § 11112(a)(4).  Therefore, to defeat the presumption that Adventist Health satisfied the HCQIA's four-factor reasonableness test, Dr. Ashraf "must show that the

facts were so obviously mistaken or inadequate as to make reliance on them unreasonable." *Moore*, 492 F. App'x at 641 (internal quotation marks and citations omitted).

Although Dr. Ashraf challenges several underlying facts upon which Adventist Health relied when making its determinations, to overcome this presumption Dr. Ashraf must show that Adventist Health relied on facts that were "so obviously mistaken or inadequate as to make reliance on them unreasonable." *Meyers*, 341 F.3d at 471. "[A] plaintiff's showing that the doctors reached an incorrect conclusion on a particular medical issue because of a lack of understanding does not meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality in participating in the peer review process." *Id.* (internal quotation marks and citations omitted). In its report recommending Dr. Ashraf's revocation of privileges, the IRC specified that it had concerns with Dr. Ashraf's ability to make judgment calls regarding the emergency nature of a cardiac patient's problems in the moment. Although Dr. Ashraf criticizes the expert opinions relied upon by the IRC, the IRC also analyzed a series of cases regarding Dr. Ashraf's failure to comply with consultation protocol and several cases in which Dr. Ashraf conducted unnecessary procedures that needlessly put patients at risk of harm. (IRC R. & R., Def.'s Ex. H at 2-9; ECF No. 38-11.)

Finally, Dr. Ashraf alleges that the Florida Department of Health and the State Medical Board of Ohio reviewed the same materials Adventist Health reviewed and determined that there was "no probable cause to believe that Dr. Ashraf committed any wrongdoing in the course of his medical practice," and argues that this indicates that Adventist Health's actions were not warranted. (Pl.'s Resp. 13, ECF No. 40.)  Dr. Ashraf additionally states that the Ohio Department of Health "deemed the whole affair a closed case not worthy of investigating," (*id.* at 16), and "decreed that the material that [Adventist Health] based its findings there unto does not render Dr. Ashraf a substandard doctor or a doctor who may be a health and safety concern," (*id.* at 4).  Dr. Ashraf points to these arguments as definitive proof that Adventist Health's investigation and subsequent hearing were improperly conducted and did not warrant revocation of his privileges.  (*Id.* at 2-3, 16.)

Dr. Ashraf's characterization of these letters is inaccurate and misleading.  The Florida Department of Health determined that "probable cause did not exist and directed this case be closed," (Florida Dep't of Health Letter, Pl.'s Ex. 1; ECF No. 40), and the State Medical Board of Ohio concluded that, "[a]fter reviewing the information [Dr. Ashraf] provided, it was determined that no further information was necessary and that the matter would be closed," (Med. Board of Ohio Letter, Pl.'s Ex. 2; ECF No. 40).  Neither of these entities provided analysis of the facts or issues

reviewed throughout the entire peer review process leading to Dr. Ashraf's revocation of privileges, nor did they state their method for evaluating the reports sent to them.  Moreover, both entities decided not to take further action after Adventist Health had already revoked Dr. Ashraf's privileges and reported the revocation to the NPDB, which could have been a factor in their determinations that further action regarding Dr. Ashraf's medical license, specifically, was not warranted.

A reasonable jury could not find, by a preponderance of the evidence, that Adventist Health did not have a reasonable belief that the suspension and ultimate revocation of Dr. Ashraf's clinical privileges were unwarranted.

C.    Adventist Health's Immunity as to Injunctive Relief for its Report to the NPDB

In addition to his request for monetary damages, Dr. Ashraf also seeks injunctive relief on the grounds that "his efforts to obtain a medical practice in Tennessee were rebuffed because of the wrong and false Adventist report deposited with NPDB." (Compl. ¶ 18, ECF No. 1-1.)  The HCQIA provides a separate immunity for any person who makes a report to the NPDB "without knowledge of the falsity of the information contained in the report."  42 U.S.C. § 11137(c).  Unlike the immunity from damages afforded to health care entities conducting peer review actions under 42 U.S.C. §§ 11111 & 11112, "the immunity involved here is complete: it is not

38

limited to immunity from liability in damages." *Reyes v. Wilson Mem'l Hosp.*, 102 F. Supp. 2d 798, 822 (S.D. Ohio 1998). "[I]mmunity for reporting exists as a matter of law unless there is sufficient evidence for a jury to conclude the report was false and the reporting party knew it was false." *Brown*, 101 F.3d at 1334.

To determine whether an entity's report to the NPDB was "false" for purposes of § 11137(c), "courts do not evaluate whether the underlying merits of the reported action were properly determined or whether the report contains inaccurate information, but rather they evaluate whether the report itself accurately reflected the action taken." *Elkharwily v. Franciscan Health Sys.*, No. 3:15-CV-05579, 2016 WL 4268938, at *4 (W.D. Wash. Aug. 15, 2016)(internal quotation marks omitted); *see also Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 177 (4th Cir. 2009)("When read in full, the report accurately states what happened."); *Brown*, 101 F.3d at 1334 (10th Cir. 1996)(finding an NPDB report potentially "false" where the report incorrectly listed the reason for the revocation of the plaintiff's privileges); *Robinson v. E. Carolina Univ.*, 329 F. Supp. 3d 156, 177 (E.D.N.C. 2018)("[A] general consensus has emerged that courts do not evaluate whether the underlying merits of the reported action were properly determined but instead evaluate whether the report itself accurately reflected the action taken." (internal quotation marks

omitted)); *Murphy v. Goss*, 103 F.Supp.3d 1234, 1239 (D. Oreg. 2015)(holding that the defendant health care provider was still entitled to immunity for its report because, even though the defendant health care provider conceded that the NPDB report it submitted contained false information, there was no evidence on the record to suggest that at the time it published the report the defendant health care provider knew that the information was false); *Hooda v. W.C.A. Serv. Corp.*, No. 11-CV-504, 2013 WL 2161821, at *6 (W.D.N.Y. May 17, 2013)("[T]he outcome of the investigation is irrelevant, as is any assertion that Plaintiff's progress notes were a justified expression of his medical opinion."). Therefore, to negate Adventist Health's immunity for reporting its revocation of his privileges to the NPDB, Dr. Ashraf must show that Adventist Health acted with malice and in bad faith.

Dr. Ashraf asserts that, in its report to the NPDB, Adventist Health published the factual findings from the IRC's report recommending revocation of Dr. Ashraf's privileges "intentionally, fraudulently, and with knowledge of their falsity." (*Id.* ¶¶ 20-23.) The factual findings from the IRC's report and recommendation are as follows:

1. Dr. Ashraf lacks critical thinking skills as evidenced by his care in the case.

2. Dr. Ashraf failed to provide emergency cardiac care to critically ill patients after urgent consultation by the Emergency Department physicians in Apopka in the and cases.

3.    Dr. Ashraf regularly fails to recognize complications in his cardiac intervention cases as evidenced by the Cardioquest reviews.

4.    Dr. Ashraf shows poor clinical judgment in the cardiac catheterization lab when dealing with patients after acute myocardial infarction. He failed to recognize a mechanical complication of myocardial infarction.

5.    Dr. Ashraf did not appropriately address the infarct-related artery in the case.

6.    Dr. Ashraf placed at significant risk because of his percutaneous intervention performed on her circumflex coronary artery. Post intervention complication to the circumflex coronary artery would have led to an absence of ventricular blood flow to both the inferior and inferoposterior walls of the left ventricle.

7.    Dr. Ashraf tends to overestimate the severity of cardiac lesions prior to intervention and underestimate residual stenoses after intervention.

8.    In 8 of 23 IVC filter cases, the standard of care was not met. Dr. Ashraf placed IVC filters in terminal patients receiving end-of-life care.

9.    Dr. Ashraf placed an IVC filter in a patient with an upper extremity DVT and pulmonary emboli. The clot source was clearly above where the filter was placed and could not provide any benefit to the patient.

10.   Dr. Ashraf did not provide cardiac consultation on numerous hospitalized patients.

11.   Dr. Ashraf failed to recognize a tricuspid valve vegetation.

12.   Dr. Ashraf did not consistently dictate reports on his interventional procedures.

13.   Dr. Ashraf did not always provide supervision for his allied health professional. He did not always

see patients and write progress notes on those
patients seen by his ARNP.

14. Dr. Ashraf performed treadmill stress testing on
patients with left bundle branch block (LBBB).

15. Dr. Ashraf failed to recognize high-risk indicators
in patients on whom he performed stress testing.

16. Dr. Ashraf did not routinely obtain informed
consents for his procedures.

17. Dr. Ashraf did not regularly utilize interpreters
for non-English speaking patients although he
admits he is not fluent in Spanish or French Creole.

18. Dr. Ashraf did not provide coverage for his
patients two weekends per month. He did not
supervise his ARNP on these weekends when she
rounded on patients and performed new patient
consultations alone.

19. Dr. Ashraf asked his ARNP to fax patient care notes
so he could sign them in lieu of seeing the patient.

20. Dr. Ashraf asked his ARNP to dictate consultations
on patients she lad neither seen nor examined.

21. The investigative review committee found Dr. Ashraf
less than forthcoming in his answers to questions
posed. His knowledge base in the practice of
cardiology is not consistent with national
standards (American Heart Association/American
College of Cardiology Guidelines and American
Society of Nuclear Medicine Guidelines).

22. Dr. Ashraf is not compliant with Florida Hospital
Medical Staff Bylaws in terms of providing patient
care for hospitalized patients and ER call
responsibilities. He also out of compliance with
guidelines regarding supervision of allied health
professional personnel.

(IRC R. & R., Def.'s Ex. H at 7-8; ECF No. 38-11.) Adventist

Health denies Dr. Ashraf's allegations that the findings it

published to the NPDB were false. (Answer ¶ 22, ECF No. 33.)

There is no evidence on the record to support Dr. Ashraf's claim that the factual findings in Adventist Health's report to were published with malice. Several of the published findings are "un-actionable opinions rather than objective statements of fact upon which a claim [for defamation] could proceed." *Bhan v. Battle Creek Health Sys.*, 579 F. App'x 438, 447 (6th Cir. 2014). Opinions, such as Adventist Health's determination that Dr. Ashraf "showed poor clinical judgment in the cardiac catheterization lab," generally are not considered defamatory because they cannot be proven false. *Id.* Further, there is no evidence on the record to suggest that Adventist Health acted with actual malice during the peer review process.

Moreover, under the section of the report requiring a description of the actions taken by the reporting entity, Adventist Health states that it conducted a formal investigation into the quality of Dr. Ashraf's care and voted to revoke his appointment and privileges, which was upheld by a hearing panel, an appellate panel, and the hospital board. (NPDB Report, Def.'s Ex. W at 4; ECF No. 38-25.) This description accurately depicts the steps taken before removing Dr. Ashraf from his position at Florida Hospital. Accordingly, Adventist Health is entitled to immunity for its report to the NPDB.

### III. RECOMMENDATION

For the foregoing reasons, it is recommended that Adventist Health's motion for summary judgment be granted.

Respectfully submitted this 13th day of August, 2019.


s/ Diane K. Vescovo
DIANE K. VESCOVO
CHIEF UNITED STATES MAGISTRATE JUDGE


NOTICE

Within fourteen (14) days after being served with a copy of this report and recommended disposition, a party may serve and file written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Failure to file objections within fourteen (14) days may constitute a waiver of objections, exceptions, and further appeal.